FILED
United States Court of Appeals
Tenth Circuit

**March 17, 2008**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

NAVAIR, INC.,

Plaintiff - Appellant,

v.

IFR AMERICAS, INC.; IFR
SYSTEMS, INC.; AEROFLEX, INC.,

Defendants - Appellees.

No. 07-3008

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 04-CV-1023-MLB)**

---

Terry L. Mann (David S. Wooding, Greg A. Drumright, Marcia A. Wood, on the
brief) of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., Wichita, Kansas, for
the Plaintiff - Appellant.

Stephen M. Kerwick (Boyd A. Byers, Carolyn L. Matthews, on the brief) of
Foulston Siefkin LLP, Wichita, Kansas, for Defendants - Appellees.

---

Before **TACHA**, **HARTZ**, and **McCONNELL**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

Plaintiff Navair, Inc. was the exclusive Canadian distributor for defendant IFR,[1] a manufacturer of military communications equipment and other products. When Navair successfully solicited a customer for an IFR product, IFR would sell the product to Navair for a discounted price and Navair would earn a profit upon resale to the customer. On October 8, 2002, IFR informed Navair that it was not going to renew their distributorship agreement and that the agreement would expire on October 31. The dispute before us concerns how long after October 31 IFR would still be bound to sell Navair certain products at a discounted price when Navair had begun negotiating a purchase by the customer before the agreement ended. In other words, how long would Navair be "protected"?

The purchase in question was one by the Canadian government in early February 2003. Navair contends that IFR granted an extension of the distribution agreement specifically to protect it in that transaction. IFR responds that there was no meeting of the minds to extend the agreement so that it would cover the February purchase.

The district court granted summary judgment to IFR. Navair appeals. We vacate the judgment and remand for further proceedings because there is a genuine dispute whether Navair was protected under an extension agreement with IFR. In particular, we hold the following: (1) There was sufficient evidence to

---

[1]For simplicity we refer to all three defendants as IFR. The defendants are (1) Aeroflex, Inc., the parent company of (2) IFR Systems, Inc., which is the parent company of (3) IFR Americas, Inc., which had the contract with Navair.

support a finding that IFR and Navair agreed to an extension protecting Navair on the Canadian purchase even if it closed in 2003. (2) Because the parties did not agree on an end date for the extension, Kansas law implies that it ended after a reasonable time. (3) There is sufficient evidence to support a determination that the reasonable time did not lapse before the purchase closed. And (4) IFR's view when the parties agreed to the extension that the extension would end on January 31, 2003, is irrelevant because there is no evidence that this view was communicated to Navair.

## I.    BACKGROUND

Navair was IFR's exclusive distributor in Canada for almost 30 years. The final distributorship agreement commenced on October 8, 2001, and expired on October 8, 2002. On the expiration date IFR wrote Navair that the agreement would not be extended and would expire on October 31, 2002. Under the terms of the agreement, Navair was protected for six months from the termination date on sales arising from outstanding quotations or prospects to be named on a list that Navair would provide to IFR. On December 12, 2002, however, Navair and IFR executed an agreement (the December Agreement) protecting Navair only until December 31, 2002, and only with respect to price quotations listed in an attachment to that agreement. The agreement also prohibited Navair from representing IFR's competitors.

The dispute between Navair and IFR concerns whether Navair was protected with respect to a purchase by the Canadian Department of National Defense (DND) in early February of 2003. In August 2002 the DND had requested a price quotation from Navair for test sets for the IRIS Program, a radio information system. On August 28, 2002, Navair faxed the DND a price quotation for the test sets. On October 23 IFR emailed the DND and Navair that manufacturing for the test sets was going forward "full throttle." Aplt. App. Vol. II at 454. The email said that IFR expected to receive the purchase order before the end of December. The December Agreement specifically addressed this transaction. It stated:

> For the Iris program, we will provide Navair a 20% discount for the initial 15 units plus spares. If we need to offer a discount to the customer, we will provide a 50/50 split. For example, if the customer receives a 4% discount off the price quoted, we would provide Navair a 22% discount vs. the 20%.

*Id.* at 408.

On December 17, 2002, Joe Farrell, the president of Navair, sent IFR president, Jeff Bloomer, an email that the DND had "requisitioned"[2] the IRIS

---

[2]According to an email from the Canadian government to Navair, the contract process begins with a "requisition," which is a request from an agency for equipment. Expensive equipment is then approved by the Procurement Review Committee, which takes approximately two weeks, and proceeds to the Director for approval, which takes approximately one week. After the Director approves the purchase, an Advance Contract Award Notice (ACAN) is posted online for at least 15 days. If no one files a protest, the contract can be awarded

(continued...)

components. The email also said, "Unfortunately, [the paperwork to complete the sale] will take a few weeks and it will be the New Year before we get the order. However, it is well advanced in the process and it is only a matter of time." *Id.* at 458.

On January 14, 2003, Farrell emailed Bloomer to request that he send the Canadian government a letter "confirming that we are your sales agent on this order." *Id.* at 459. The next day Bloomer sent the DND the following letter:

> Re:    IRIS Requirements
>
> Please be advised that Navair is the authorized supplier for this order. Delivery for systems ordered will be made no later than 31-Mar-03 as long as order is received by 31-Jan-03. Any other items may be delayed as referenced on original quotation.

*Id.* at 460.

On January 23, 2003, Farrell emailed Bloomer to inform him that the contracting officer for the Canadian government had predicted an "approximate timetable" of "5–6 weeks . . . assuming no hick ups." *Id.* at 411. Other language in the email suggests that there had been some discussion of Navair's commitment in the December Agreement not to represent IFR competitors. Farrell wrote: "I can assure you that Navair is not competing with IFR on the

---

[2](...continued)
within a week of the closing date.

IRIS product line and we are honoring our agreement. We are actively marketing competing products for the other product lines as we indicated we would." *Id.*

A few minutes later, Bloomer forwarded Farrell's email to other IFR employees, writing: "I guess we should discuss! I told Joe [Farrell] yesterday that if we did not get an order by month end then it was going to be handled direct by IFR. I called twice today because he promised me an answer. I got this email as opposed to a phone call." *Id.* at 666–67. IFR employee Sam Strang responded to Bloomer later that day, suggesting that there was nothing to discuss because the order would not be in by the 31-day extension Bloomer had given Navair. The next day, Bloomer replied to Strang: "I agree we need to move past Navair." *Id.* at 666.

On January 28, 2003, Strang emailed Bloomer requesting him to write Navair a letter stating that it no longer represented IFR. The proposed letter, which was never sent, said:

> We have twice extended the NAVAIR distribution agreement (for the IRIS program) to meet your requests for a little more time to make the order happen. First [IFR] was told the order would be in before Christmas. Then we were asked to extend through 31 January 2003 because the order had hit a small snag but would be in by the end of January. Now NAVAIR is requesting another 6 plus weeks.
>
> [IFR] will stand by it's [sic] last extension but will not grant another. As of 1 February 2003 Canada DND and Canada Public Works will be notified (in writing) the

official [IFR] Representative/Agent for Canada is Testforce.

*Id.* at 554.

Farrell emailed Bloomer the following day:

> Further to our telephone conversation last evening where you indicated that a decision had been made to change the terms of our Agreement dated December 12, 2002.  I await your written confirmation of the decision but I understand that IFR is proposing effective January 31, 2003, to terminate its support to Navair in the sale of 15 IRIS units to the Canadian Government.  I understand that it is being done on the basis that Navair represents competing products.
>
> Navair strongly disputes this contention.  We do not represent a competing product to the IRIS.  Navair has aggressively pursued this sale since mid 2002 and worked what was an original request for two units into the sizeable order it is today.  It is not Navair's fault that the wheels of the Government move so slowly and that the order has not been received yet.  It is now only a matter of time before it happens, unless someone upsets the process which is well underway.  I believe it is in both our interests to maintain the current arrangement to ensure a timely completion of the sale.
>
> . . .
>
> If my understanding is correct, this is nothing more than an effort on IFR's part to squeeze Navair out of the profit it has earned working this sale for many months. Navair will do everything necessary to protect it's [sic] position here.

*Id.* at 651.

Also on January 29, IFR sent Navair a letter terminating the agreement effective immediately on the ground that Navair had violated the noncompete provision of the December Agreement. The next day, IFR sent Navair a second, shorter termination letter:

> As we discussed on the phone, IFR is discontinuing representation by Navair for the IRIS program, effective February 1, 2003. Our reasons are as follows:
>
> - A number of companies now being represented by Navair are direct competitors of IFR.
>
> - The IRIS requirement in question will not be purchased through your support contract.
>
> We will be notifying the DND of this change and that Testforce Systems Inc. is the official representative/ agent for Canada. We will continue to support Navair for any open R&O contracts with the DND. Please let me know if you have any questions regarding this matter.

*Id.* at 413.

The content of any oral communications between Navair and IFR regarding an extension of the December Agreement is unclear. Bloomer testified at his deposition that "we extended this agreement on the IRIS program after December 31st to January 31st," but he did not state when IFR granted the extension. *Id.* at 588. He also testified that he was not sure whether he had told Farrell before January 20 that the agreement extended only until January 31.

Farrell likewise testified that he and Bloomer had agreed to extend the December Agreement with respect to the IRIS test sets, but he, too, did not provide the date when this agreement had been reached, nor did he state that they had agreed on a termination date. When asked, "Did [Bloomer] indicate to you at some point in time that whatever protection IFR was going to continue to give Navair with regard to the IRIS quote was going to be limited to the end of January?" Farrell answered, "No." *Id*. Vol. I at 198. Farrell stated that he thought that the agreement would continue for "a reasonable time frame, subject to the process that was being followed by the Government." *Id.* at 198.

During the first week of February the DND contract was awarded to Testforce Systems, Inc., IFR's new sales representative. On February 6 Farrell notified Bloomer that he was aware that the contract had been awarded and stated that "Navair does not intend to protest this award with the Crown but will seek redress through legal action against IFR." *Id*. Vol. II at 560.

As promised, Navair sued IFR on January 27, 2004, in the United States District Court for the District of Kansas, raising a variety of claims, including breach of contract. Navair moved for summary judgment on its contract claim on the ground that IFR had breached the contract by terminating Navair as its supplier without justification. On the same day, IFR filed a cross-motion for summary judgment, arguing that it had not breached the December Agreement, that any alleged oral extension of the agreement was unsupported by

consideration, and that there was no meeting of the minds because the parties did not agree on an essential term, the time of performance. In its opposition to Navair's motion for summary judgment, IFR also argued that if there was a contract, Navair had breached the noncompete provision.

The district court granted summary judgment in IFR's favor, ruling that "Navair has not shown that the parties contractually agreed to an extension of the December Agreement beyond the end of January 2003," and therefore "Navair's breach of contract claim fails, because that is when the contract, had one existed, would have been breached." *Id*. Vol. I at 372. It found no "proof that the [December] Agreement was extended in the manner Navair claims." *Id.* at 369. In particular, it ruled that neither the January 15 letter to the Canadian DND identifying Navair as IFR's distributor nor the "evidence that Navair's president thought the December Agreement had been extended for a 'reasonable time'" was sufficient to create a genuine dispute of material fact. *Id.* at 370. The court concluded:

> [I]t is undisputed that IFR was willing to protect
> Navair's price quotations until January 31, 2003, but
> there is no evidence the parties had any agreement,
> understanding, or contract beyond that date. . . . Thus,
> despite taking all the facts in the light most favorable to
> Navair, it is undisputed that the parties did not have a
> meeting of the minds with respect to an extension of the
> December Agreement beyond January 31, 2003.

*Id.*

-10-

On appeal Navair argues that IFR breached a valid oral agreement supported by consideration, that it did not violate the noncompete provision, and that it is entitled to summary judgment, damages in Canadian dollars, and prejudgment interest at 10% per year. IFR denies that there was an agreement because there was no meeting of the minds regarding the length of the agreement, and asserts that if an agreement existed, it did not extend beyond January 31, 2003. (For the purposes of appeal, IFR does not contend that the alleged agreement was unsupported by consideration.) IFR also argues that we should not consider Navair's contentions in favor of granting it summary judgment because the district court did not rule on these contentions and "they are subject to disputes of material fact." Aplee. Br. at 21. In particular, IFR states that there are fact disputes over whether Navair could (and did) represent competitors, what measure of damages is appropriate, and whether Navair failed to mitigate damages.

## II.     DISCUSSION

We review a grant of summary judgment de novo, viewing the evidence "in the light most favorable to the party that did not prevail." *Jacklovich v. Simmons*, 392 F.3d 420, 425 (10th Cir. 2004). Summary judgment is proper when there is no genuine dispute over any material fact, and a party is entitled to prevail as a matter of law. *See id.*; Fed. R. Civ. P. 56(c). The parties agree that the substantive law of Kansas governs this diversity case. *See Hjelle v. Mid-State*

-11-

*Consultants, Inc.*, 394 F.3d 873, 877 (10th Cir. 2005) (forum state's substantive law governs in diversity action).

Under Kansas law, a plaintiff must prove the following to establish a breach-of-contract claim:

> (1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach.

*JP Morgan Trust Co. v. Mid-America Pipeline Co.*, 413 F. Supp. 2d 1244, 1272 (D. Kan. 2006).  On appeal IFR argues only that the first element was not satisfied.

It is undisputed that the December Agreement provided that Navair would be protected if the DND transaction closed by December 31, 2002.  We conclude that there is ample evidence that the parties extended this agreement, at least with respect to the DND purchase, beyond that date.  IFR, at Navair's request, sent the DND a letter on January 15 stating:  "Please be advised that Navair is the authorized supplier for [the IRIS] order.  Delivery for systems ordered will be made no later than 31-Mar-03 as long as order is received by 31-Jan-03."  Aplt. App. Vol. II at 460.  It would be hard to explain why IFR would write this letter absent an agreement with Navair covering the transaction.  Moreover, Bloomer, the president of IFR, testified at his deposition that "we extended this agreement

-12-

on the IRIS program after December 31st to January 31st," *id.* at 588; and Farrell, Navair's president, testified that he and Bloomer had agreed to an extension of the December Agreement for the IRIS test sets, but he disagreed that the extension lasted only until January 31st.

The disputes on appeal relate to the end date of the extension of the December Agreement. Although Bloomer testified that the extension was only to January 31, there is no written agreement to that effect, and Farrell denied that Bloomer had set an end date. Among the support for Farrell's testimony in this regard is IFR's letter of January 30 terminating their agreement effective February 1, 2003; the letter would have been unnecessary if the agreement ended by its own terms on January 31. Thus, there is a genuine factual dispute regarding whether the parties agreed to limit the extension to January 31, and IFR would not be entitled to summary judgment on that ground.

On the other hand, there is no evidence to support any other specific termination date for the extension. IFR raises two arguments why there was therefore no enforceable contract covering the DND's February purchase. First, it contends that the end date was an "essential term" of any contract extension and the absence of such a term precluded formation of a contract. Second, it contends that IFR's understanding was that the extension would end on January 31, so there was no meeting of the minds for an extension beyond that date. We reject both contentions.

-13-

The first contention must be rejected under the authority of *Arnold v. S.J.L. of Kansas Corp.*, 822 P.2d 64 (Kan. 1991). That opinion said that a "basic principle of contract construction is that where a contract does not specify the time of performance or for the occurrence of a necessary event, a reasonable time will be implied." *Id.* at 67. *See also Arrowhead Constr. Co. v. Essex Corp.*, 662 P.2d 1195, 1202 (Kan. 1983) (binding agreement can exist "even though one or more terms are missing or left to be agreed upon") (internal quotation marks omitted), *abrogated on other grounds by Wichita Sheet Metal Supply, Inc. v. Dahlstrom & Ferrell Constr. Co.*, 792 P.2d 1043 (Kan. 1990); Restatement (Second) of Contracts § 33 cmt. d ("Valid contracts are often made which do not specify the time for performance. Where the contract calls for a single performance such as the rendering of a service or the delivery of goods, the time for performance is a 'reasonable time.'"); 1 E. Allan Farnsworth, Contracts Vol. I § 3.28 (2d ed. 2001) ("Where no time is specified for performance of a duty such as that to deliver goods or pay the price, courts have had little difficulty in supplying a term requiring performance within a 'reasonable' time. What is reasonable in such a case depends on all the circumstances." (footnote omitted)); 5 Margaret N. Kniffin, Corbin on Contracts § 24.29 (Rev. ed. 2007) ("A contract is not invalid for indefiniteness for the mere reason that it does not specify how long performance should continue"). According to *Arnold*, the absence of an agreed-upon end date does not mean that IFR and Navair had no contract to

extend protection to Navair for purchases after December 31, 2002. Rather, it means that Navair would be protected only for a reasonable time. Because the evidence in the record before us does not require either a finding that such a reasonable time lapsed before the DND purchase or a finding that it lapsed after that purchase, we remand for further proceedings on the issue. *See Arnold*, 822 P.2d at 67 (jury ordinarily determines what is a reasonable time).

IFR attempts to distinguish *Arnold* on the ground that the parties in that case *intentionally* omitted a durational term. In contrast, it continues, any omission in this case was inadvertent and IFR thought that the extension would terminate on January 31. As we understand the argument, IFR is contending that a reasonable-time term can be implied only if the minds of the parties met on this point—that is, such a term can be incorporated into the agreement only if both parties thought that the termination date would have to be set by a court in the event of a dispute. IFR further argues that the minds of IFR and Navair met, if at all, only to the extent that Navair would be protected until January 31, 2003, because, as IFR's internal communications reveal, IFR's understanding was that protection would lapse on January 31. We are not persuaded.

To begin with, nothing in *Arnold* suggests that the court's decision was based on a determination that the parties had intentionally omitted a durational term. For all the opinion indicates, the omission was inadvertent. Moreover, IFR makes the far-too-common error of construing too literally the phrase "meeting of

the minds."  Contracts are not formed by comparing mental states; they are

formed by what the parties *communicate*.  As a leading treatise states:

> In the formation of contracts . . . it was long ago settled
> that secret, subjective intent is immaterial, so that
> mutual assent is to be judged only by overt acts and
> words rather than by the hidden, subjective or secret
> intention of the parties.  During the first half of the
> nineteenth century, however, there were many
> expressions which seemed to indicate a contrary rule.
> Chief among these was the familiar statement, still
> invoked by many courts today, that a contract requires a
> "meeting of the minds" of the parties.  However, the
> fundamental basis of contract in the common law is
> reliance on an outward act (that is, a promise), as may
> be seen by the early development of the law of
> consideration as compared with that of mutual assent.

1 Richard A. Lord, Williston on Contracts § 4:1 (4th ed. updated 2007) (footnotes

omitted).  Similarly, the Restatement (Second) of Contracts explains:

> The element of agreement is sometimes referred to as a
> "meeting of the minds."  The parties to most contracts
> give actual as well as apparent assent, but it is clear that
> a mental reservation of a party to a bargain does not
> impair the obligation he purports to undertake.  The
> phrase used here, therefore, is "manifestation of mutual
> assent."

*Id*. § 17 cmt. c.

These authoritative statements are not inconsistent with Kansas law.  IFR

has not cited a Kansas case in which an unexpressed reservation precluded

formation of a contract.  Typically, judicial opinions stating the meeting-of-the-

minds principle then point to objective communications and conduct in resolving

the case.  For example, one of the decisions relied upon by IFR concluded, "It cannot be said that the parties manifested mutual consent to terms of a contract for sale." *Steele v. Harrison*, 552 P.2d 957, 963 (Kan. 1976).  We think that modern Kansas law is accurately reflected by the recent statement by the Kansas Court of Appeals in *Southwest & Associates, Inc. v. Steven Enterprises, LLC*, 88 P.3d 1246, 1249 (Kan. Ct. App. 2004) (citations and internal quotation marks omitted):

> In order to find that Southwest and Steven Enterprises entered into an enforceable contract, Southwest is required to show a meeting of the minds as to all essential terms.  In determining intent to form a contract, the test is objective, rather than subjective, meaning that the relevant inquiry is the manifestation of a party's intention, rather than the actual or real intention.  Put another way, the inquiry will focus not on the question of whether the subjective minds of the parties have met, but on whether their outward expression of assent is sufficient to form a contract.

Thus, even if IFR understood that the extension would lapse on January 31, 2003, that understanding is irrelevant because there is no evidence that this understanding was communicated to Navair when the two parties agreed to an extension of the December Agreement.

In sum, we hold that there was sufficient evidence to support a finding that IFR agreed with Navair to extend the December Agreement with respect to the DND purchase and that the extension would continue for a reasonable time. Navair would have us go further and hold that it is entitled to summary judgment

because the sale took place within a reasonable time. We agree with IFR, however, that it is better practice to have the district court rule in the first instance on the issues remaining in this case. *See R. Eric Peterson Constr. Co., Inc. v. Quintek, Inc. (In re R. Eric Peterson Constr. Co.)*, 951 F.2d 1175, 1182 (10th Cir. 1991).

## III.   CONCLUSION

We VACATE the district court's grant of summary judgment in favor of IFR, and REMAND for further proceedings.